Commonwealth *v.* Kelinson, Appellant.

Argued June 16, 1962. Before RHODES, P. J., WRIGHT, WOODSIDE, WATKINS, MONTGOMERY, and FLOOD, JJ. (ERVIN, J., absent).

*Stanley L. Kubacki,* for appellant.

*Burton Satzberg,* Assistant District Attorney, with him *Arthur J. Marion* and *Arlen Specter,* Assistant District Attorneys, *Paul M. Chalfin,* First Assistant District Attorney, and *James C. Crumlish, Jr.,* District Attorney, for Commonwealth, appellee.

OPINION BY WATKINS, J., September 13, 1962:

This is an appeal by Jack Kelinson, the defendant-appellant, from the judgment of sentence of the Court of Quarter Sessions of Philadelphia County, after conviction before Judge WEINROTT, of the court below, sitting without a jury, on bills of indictment charging Jack Kelinson, also known as Barry Kelinson, with violation of the worthless check act and cheating by false pretenses; and from an order denying motions in arrest of judgment and for a new trial. After denial of his post trial motions he was sentenced to make restitution to the private prosecutor in the amount of $4153.44, and to undergo imprisonment on each indictment for not less than three months nor more than twenty-three and one-half months in the county prison; sentences to run concurrently.

The defendant Jack Kelinson was president of the now defunct Barkel Meat Packing Co., Inc., and with his wife, owned 51% of the stock of the corporation. The defendant's son, Barry Kelinson, was secretary-treasurer of this company, and owned 49% of the stock. Barkel Meat Packing Co., Inc. was engaged in the

wholesale meat business. For several months Barkel was doing business in the purchase of meat with McKenney Meat Co. of Lexington, Kentucky. On February 2, 1960, a shipment of meat was delivered to Barkel by Yeary Transfer Co., Inc. The driver of the delivery van was a man named Casey. The terms of the transaction, as clearly enunciated on the delivery ticket was "check on delivery". The shipment was accepted by Barry Kelinson, on behalf of Barkel on February 2 and the defendant testified that he could not remember but may have been present. Barry initialed the shipping order and prepared and signed a corporation check dated February 4, 1960, which he delivered to Casey.

The Commonwealth bases it case upon the issuance of the check in the amount of $8453.44, which was returned for want of sufficient funds and has never been paid. Because of the nature of its business every check drawn by Barkel to this supplier was post-dated. The instant check was the only one not paid.

The Act of 1939, June 24, P. L. 872, §854, 18 PS §4854, known as the "Worthless Check Act", provides, inter alia: "Whoever, with intent to defraud, makes, draws, utters or delivers any check, draft, or order for the payment of money, upon any bank, banking institution, trust company, or other depository, knowing, at the time of such making, drawing, uttering, or delivering, that the maker or drawer has not sufficient funds in, or credit with, such bank, banking institution, trust company, or other depository, for the payment of such check, although no express representation is made in reference thereto, is guilty of a misdemeanor, and upon conviction thereof, shall be imprisoned not exceeding two (2) years, or fined not exceeding one thousand dollars ($1,000), or both."

The defendant contends that post-dated checks do not come within the purview of the "Worthless Check

Act". The making of a post-dated check implies a promise to deposit money in a bank at a future date and there is nothing in this statute that makes it unlawful to promise and fail to pay at a future date. *Com. v. Massaro*, 97 Pa. Superior Ct. 149 (1929); *Com. v. Kaminski*, 29 Luz. L. R. 70 (1933); *Com. v. Malinowski*, 31 Northumb. L. J. 29 (1958).

The courts generally, in the more recent cases, have taken the view that such a check is not within the contemplation of "bad check" statutes, such as ours. 95 A.L.R. 496; 29 A.L.R. 2d 1181. And the leading case in Pennsylvania setting forth the rule in this Commonwealth is *Com. v. Massaro*, supra, where this Court said, at page 151: "By the terms of the act intent to defraud at the time of making or delivering the check is an essential element of the crime. This was a post-dated check. As such it differed from an ordinary check in that it carried on its face implied notice that there was no money presently on deposit available to meet it, with the implied assurance that there would be such funds on the day it became due. At most it amounted to a promise that on the day it became due the drawer would have in the bank a sufficient deposit to meet it."

As President Judge RHODES pointed out in *Com. v. Bushkoff*, 177 Pa. Superior Ct. 231, 110 A. 2d 834 (1955), the elements of the offense must be established by the evidence and one of the essential elements is knowing at the time of the making that there is insufficient funds to cover it. This is impossible when the check on its face made it due in the future and the payee in accepting it is looking to the promise of payment in the future and is not then defrauded. It is elementary that the act must be strictly construed.

The negotiable instrument law defines a check to be a bill of exchange drawn on a bank, payable on demand, and fraud cannot be predicated upon nonper-

formance of a future promise, a post-dated check being a mere promise to discharge a present obligation at a future date. *People v. Mazeloff,* 229 App. Div. 451, 242 N.Y. Supp. 623 (1930).

Post-dated checks are today a form of negotiable paper, a credit instrument, containing a promise to pay on the date appearing on the face of the instrument, that are in everyday commercial use. Post-dating the check, in itself, is a manner in which commercial usage permits the drawer to put a payee on notice that he does not have sufficient funds on deposit, at the time of making, to pay the check. In *Champion v. Gordon,* 70 Pa. 474 (1872), Mr. Justice SHARSWOOD said: "What the drawer undertakes is, that on a day named he will have the amount of the check to his credit in the bank. In the meantime he wants the full and free use of his entire deposit."

A post-dated check is one that is made and delivered at sometime prior to the day of its date. It is generally held to be payable at sight or upon presentation at the bank at any time on or after the day of its date. It differs from an ordinary check in that it has on its face implied notice that there is no money presently on deposit available to meet it, with the implied assurance that there will be such funds on the day it becomes due. It is a familiar and useful form of negotiable paper and plays an important part in the role of commerce. Ordinarily its purpose is to obtain an extension of credit. The maker knows when he issues a post-dated check that there are no funds on deposit available to meet it. *Lovell v. Eaton,* 99 Vt. 255, 256, 133 A. 742, 743 (1925).

The law in Pennsylvania is clear that the acceptance of a post-dated check amounts to a delivery on credit and the remedies for the nonpayment of such checks are set forth in the Uniform Commercial Code. "Where the instrument offered by the buyer is not a payment

but a credit instrument such as a note or a check postdated by even one day, the seller's acceptance of the instrument insofar as third parties are concerned, amounts to a delivery on credit and his remedies are set forth in the section on buyer's insolvency. As between the buyer and the seller, however, the matter turns on the present subsection and the section on conditional delivery and subsequent dishonor of the instrument gives the seller rights on it as well as for breach of the contract for sale." 1953, P. L. 3, §2-511, 12A PS §2-511, U.C.C. Comment No. 6.

McKenney Meat Co. chose to use the facilities of Yeary Transfer Co., Inc. to deliver the meat to Barkel Meat Packing Co., Inc. There is no question that this company and its driver were agents of McKenney. The delivery ticket stated the terms that Casey, the agent for McKenney, was to receive a check on delivery. The argument that some time passed between the delivery of the check and its final receipt by McKenney does not weigh against the implied knowledge from the face of checks in thirty separate transactions that the principal had knowledge that the agent was being given post-dated checks.

"The agent may, however, be given such powers by the express terms of the agency agreement, properly construed, and, where that is done, collection or receipt of sums due the principal is within his authority to the extent that it is within the contemplation of the agreement, as where a creditor directs another as his agent to collect or receive payment of an obligation or obligations . . . .

"Indeed, no express mandate is required; such authority may arise by implication when it is a usual and reasonably necessary incident to the execution of the powers or the performance of the business confided to the agent . . ." 2 C.J.S. Agency §107.

"A person has notice of a fact if his agent has knowledge of the fact, reason to know it or should

know it, or has been given a notification of it, under circumstances coming within the rules applying to the liability of a principal because of notice to his agent." Restatement (2d), Agency, §9(3), page 45.

McKenney had notice of the business operations of the Barkel Meat Packing Co., Inc. and had notice that Barkel had issued post-dated checks, having acquired such notice by constructive notice to Yeary Transfer Co., Inc. which was acting as McKenney's agent for delivery of the meat and receipt of the check and by actual notice as a result of past dealings with Barkel.

If McKenney did not want his agent to accept a post-dated check he could have so instructed Yeary. The agent was within the scope of his authority in accepting the check since the terms were "check on delivery". It is clear that no other instruction was given, because during the trial, over objections of counsel for the defendant, McKenney was asked as to "Explicit instructions" given to the driver Casey: "The Court: I will permit it. BY THE COURT: Q. What were the instructions? A. The instructions were to be sure to get the check before he left the company, because one time they had left one." No instructions not to take a post-dated check, although there is overwhelming evidence that McKenney knew that Barkel issued post-dated checks.

The appellant also contends that his conviction of obtaining money under false pretenses cannot stand because the evidence does not support it. To bring this case within the provisions of the law defining cheating by false pretenses, Act of 1939, P. L. 872, §836, as amended, 18 PS §4836, "there must be found to co-exist three separate elements: (1) a false pretense, as a false assertion of existing fact; (2) obtaining property or something of value thereby; (3) an intent to defraud." *Com. v. Matthews,* 196 Pa. Superior Ct. 60, 173 A. 2d 772 (1961). A mere promise for future conduct does

not suffice to constitute a false pretense even though the promisor never intended to perform. *Com. v. Mauk,* 79 Pa. Superior Ct. 153 (1922).

The fact that the check dated February 4, 1960, drawn and delivered on February 2, 1960, was a post-dated check, is not in controversy. There must have been a false representation as to the check dated February 4, 1960, a false representation of a present existing fact. A post-dated check is not a present promise; is not a false representation of a present existing fact that there are funds on deposit to pay the check. A post-dated check declares boldly on its face that it is nothing more than a promise to pay in the future on or after the date appearing on the face of the instrument.

The Commonwealth has failed to establish by the evidence, as a matter of law, the offenses for which this defendant stands convicted and the refusal of his motions in arrest of judgment was error.

The defendant also contended that the verdict could not stand because the defendant never signed the check but in view of our disposition of this appeal for other reasons it is unnecessary to discuss this further contention. Suffice it to say that we are at a loss to know why the prosecution was not brought against Barry Kelinson, whose name appears as the drawer of the check, and the record indicates that he, in fact, signed it, especially in view of the fact that the Commonwealth made no effort to prove that the signature on the check was executed by Jack Kelinson and it is difficult to find from this record that there was proof of any kind sufficient to go to a jury that Jack Kelinson was known as Barry Kelinson. If Barry had been the defendant, all discussion of Jack's participation, ratification and vicarious liability would disappear from the case.

Judgment arrested and the defendant discharged.