## Commonwealth v. White

*Joseph Nelson*, District Attorney, and *Robert Banks*, First Assistant District Attorney, for Commonwealth.

*Michael Wherry*, for defendant.

ACKER, J., October 20, 1972.—Francis E. White, the defendant, being confined in the Mercer County Jail, filed a petition for a writ of habeas corpus. Testimony was taken throughout most of the day of October 13, 1972, after which the writ of habeas corpus was denied. By agreement of the parties through their counsel, rather than return the matter to the district magistrate for a repetition of the receipt of the testimony given before the court in the habeas corpus action, it was agreed that the court would act as a sitting magistrate and make a determination as to whether there was sufficient evidence to sustain a

16

prima facie case upon each of the charges. Likewise, this court received testimony concerning defendant's conduct from the time of the filing of the charges and the reason for his failure to appear in court previously and entered an order reducing the bond from $50,000 to $12,525.

The matters for determination concern criminal charges arising from activities of defendant and others during the year of 1970. From the testimony received in the case including many exhibits it would appear that in the years 1969 and early 1970 defendant, Francis E. White, along with several other persons operated a company known as Eastern Dynamics, Inc., with offices in the First National Bank Building, Hermitage Square, Hickory Township, in this county. In early 1970, those persons interested in Eastern Dynamics, Inc., decided to form a new corporation known as Transcontinental Leasings Systems, Inc. Moneys for the operation of this corporation were to come basically from two sources. One, the sale of stock and second, the sale of franchises to operate for Transcontinental Leasings Systems, Inc., in various parts of the United States. The Pennsylvania Securities Act[1] requires registration with the Securities Commission of Pennsylvania when stock is proposed to be sold. If, however, the original issue of the stock is in good faith and not for the purpose of avoiding the provisions of the act for the sole account of a corporation and if the number of stockholders are to be 25 or less it is possible to secure an exemption. However, the sale of the stock cannot be by the use of advertisements, circulars, agents, salesmen, solicitors or any form of public solicitation.[2] Such an application was

---

[1] Act of June 24, 1939, P. L. 748, sec. 1, 70 PS §31, et seq.

[2] Act of June 24, 1939, P. L. 748, sec. 1, as amended, 70 PS §32, subsection (10).

made to the Pennsylvania Securities Commission in March and an exemption under the above-mentioned section was granted March 13, 1970. By that exemption the company was not permitted to solicit stock by the use of any written brochure or information sheet, nor was it permitted to engage salesmen and pay a commission. Despite this agreement, on April 16, 1970, by its own records the corporation paid a commission of $175 for the sale of stock to one of its employes or representatives. During this time Francis E. White was the president and chief managerial officer of the corporation and was directly responsible for the conduct of his employes. The testimony of payment of the commission came directly from the books and records of Transcontinental. Wherefore, this court concludes, and, in fact, it was conceded by defendant at the hearing, that there was sufficient evidence to establish a prima facie case against defendant for violations of the Pennsylvania Securities Act.

Attention is now turned to whether there was sufficient evidence to establish a prima facie case of a general criminal scheme or plan. A reading of the brochure and other literature makes it difficult to determine exactly how the founders of Transcontinental expected to produce the results which they informed the prospective stock purchasers would follow. It is clear as to what they promised. Stock was to be sold in units of 31,250 shares each at a purchase price of $15,000. One of the purchasers was William Tanko, a 57-year old Hungarian who immigrated to the United States in 1959 continuing his trade as a tailor. Mr. Tanko at the time of his purchase of two units for $30,000 had limited knowledge of the English language as to reading and, therefore, repeatedly stated through his testimony that he relied on the good

faith and representations of defendant personally. By those representations he was to receive $5,000 per year return for each unit. Therefore, he was to have received by the representations $10,000 in the first year upon a $30,000 investment. This, of course, never materialized and he did not receive any return for his money. The brochure after citing examples of industrialists of past years who made spectacular financial returns and formed many of the corporations now dominating the American industrial scene throws out the challenge to the prospective purchaser that he is given an opportunity to join the ranks of successful persons and benefit similarly as did Henry Ford, William Durant, the organizer of General Motors, Charles Kettering, the "genius" responsible for self-starter, the Dodge boys, J. P. Morgan, who "did not have enough confidence in automobiles to underwrite General Motors, but later purchased $19,000,000 in orders from Studebaker for $6,000,000," and Alfred Sloan, who "invented the modern corporation." The closest that one comes to learning what the corporation is all about from its literature appears in the brochure as follows:

"We at TLS believe that the consumer is tired of fighting the 'buy on time' stigma and will enthusiastically endorse the 'pay as you use' theory, because this idea of 'use value' in capital conservation can aid in keeping dollars fully utilized in our present day inflationary economy. Rental or leased dollars come from daily income or earnings, purchase dollars usually dip into working capital. The conception will also assist manufacturers in determining production quotas and budgets and will aid in the predetermination of the average life of a car."

And further:

"The TLS existing network of 200 brokers and the

planned expansion of this marketing branch will be approximately 1,000 outlets. We know we can get the finished product into the hands of the consumer quicker and without confusion, and on a use-value basis. Our planned increased activities into the fleet leasing market will greatly expand the number of rental units the corporation has in the field."

It would, therefore, appear that what the corporation was attempting to sell was a new form of leasing motor vehicles which would be more palatable to the customer than any plan then existing. Exactly how this would happen was not explained. However, it would appear that a prerequisite for the effective operation of any auto-leasing plan was the necessity to get a large number of automobiles at a favorable price from a reliable source so that the so-called "brokers" across the United States could in fact have vehicles for lease. There was no evidence that the corporation ever effectively secured a source for a large number of automobiles to fit the requirements of the declared purpose of the corporation. During the deliberation stage of Mr. Tanko between May 26th and June 30th when the last of the $30,000 was paid, defendant personally represented to Mr. Tanko that the plan was sound, the best evidence of which was his own personal investment of $60,000 of his own money in the corporation. By the prospectus of December 22, 1970, this was at best a half truth. Francis White purchased all of the Class A stock in Transcontinental by entering into a subscription agreement with the corporation on March 16, 1970. Thereby he was to purchase 250,000 shares of Class A common stock for a consideration of $61,518. He was to pay $30,000 to the company and issue to it as security for the balance of the consideration certificates for 36,299 shares of common stock of Eastern Dynamics and his

demand noninterest bearing note made payable to the company in the amount of $31,518. There is no representation as to the value of the Eastern Dynamics, Inc., stock, but by considering the financial statement of Transcontinental which according to its accountant is really a condensation of Transcontinental and Eastern Dynamics as of May 31, 1970, the company was operating at a loss of $64,603. There is no evidence that any actual cash money was put into the corporation by defendant, at least up to the time of his representation to Mr. Tanko of an investment of $60,000 in cash.

The Commonwealth in its information has elected to charge defendant with the offense of fraudulent conversion and conspiracy. It requested this court during the course of the hearing for permission to amend its criminal complaint from fraudulent conversion to cheating by false pretenses pursuant to the Act of June 24, 1939, P. L. 872, sec. 836, 18 PS §4836. This court concludes that there was sufficient evidence presented for a prima facie case as to the William Tanko matter for the offense of conspiracy and cheating by false pretenses and an appropriate order will be entered permitting the amendment prayed for.

As time progressed in the life of Transcontinental it applied for permission to sell notes and warrants through an application to the Pennsylvania Securities Commission. That permission was granted in September of 1970. Immediately thereafter a large advertisement was put in the Sharon Herald which resulted in Elsie Jean Fobes coming to the offices of the corporation and paying for debenture bonds in the total amount of $2,000. The representative of the corporation who made the sale was John G. Howe, the sales manager. Despite frequent phone calls thereafter the debenture bonds were never forthcoming and Miss

Fobes never received any evidence of her purchase. Defendant, Francis E. White, is charged with fraudulent conversion and conspiracy concerning this sale. However, by July 16, 1970, Francis E. White, defendant, had signed a management consulting contract for the corporation with a hospital in Lexington, Kentucky, and was spending a great deal of his time in Kentucky. There was no evidence that defendant knew of this particular sale or personally received any of the moneys. The corporation was authorized to sell such debentures by the Pennsylvania Securities Commission. The issue is then squarely presented as to the criminal responsibility of the president of a corporation for the conduct of his sales manager where the corporation goes out of existence and bonds are not issued which have been paid for. The question of criminal guilt of corporate officers for acts of employes or agents has caused our courts great concern through the years. This is what is known as vicarious criminal liability. Clearly at common law such liability could not be imposed. Our Supreme Court has stated:

"It would be unthinkable to impose vicarious criminal responsibility in cases involving true crimes. Although to hold a principal criminally liable might possibly be an effective means of enforcing law and order, it would do violence to our more sophisticated modern-day concepts of justice. Liability for all true crimes, wherein an offense carries with it a jail sentence, must be based exclusively upon personal causation": Commonwealth v. Koczwara, 397 Pa. 575, 155 A. 2d 825 (1959).

It is only where a criminal scheme or plan has been initiated and is supervised by the president that this defendant could be held criminally responsible. Once the Pennsylvania Securities Commission permitted the sale of the securities it obtained a mantle of

respectability and operated under an umbrella of legality. This in itself, however, would not prevent criminal responsibility. The fatal missing link, however, of the Commonwealth's case as to this alleged offense is the void of any testimony that defendant participated in or even knew of this particular sale as opposed to that of the Tanko transaction in which he actively participated and was the main cause of Mr. Tanko relieving himself of $30,000. Wherefore, we hold that there was insufficient evidence to establish a prima facie case as to the Fobes transaction.

Defendant, White, is also charged with a violation of the Worthless Check Act of June 24, 1939, P. L. 872, sec. 854, 18 PS §4854. Anthony Chieffo, a resident of the City of Sharon, lent to the corporation certain moneys while it was still known as Eastern Dynamics. Eventually these moneys were repaid with the exception of $5,000. Mr. Chieffo held a note against the corporation in that amount. On either October 15th or 16th, 1970, defendant after repeated telephone calls came to Mr. Chieffo along with a David Hillman, the vice president and corporate secretary of Transcontinental. After some negotiating Mr. Chieffo agreed to invest $3,000 of the $5,000 in Transcontinental but insisted on being paid $2,000. At that date and time defendant, Francis E. White, wrote a personal check to Mr. Chieffo in the amount of $2,000 and Mr. Chieffo surrendered his $5,000 note previously mentioned. Needless to say the check bounced twice and Mr. Chieffo was required to pay to the bank the $2,000 which it had paid to him in initially honoring the check. There is some confusion in the testimony as to whether Mr. Chieffo took the check to the bank for deposit on the day that he received the check or the following morning. He initially testified that he took it for deposit on that day. If so, it would not be a post-

dated check. If he took it for deposit the following day it is contended by defendant that the check was in fact post-dated to that day of October 16th. Being a post-dated check it is contended the provisions of the Worthless Check Act are not applicable, for Mr. Chieffo was merely extending credit by accepting such a check. Commonwealth v. Kelinson, 199 Pa. Superior Ct. 135, 184 A. 2d 374 (1962), and Commonwealth v. Massaro, 97 Pa. Superior Ct. 149 (1929), both stand for the proposition that if a post-dated check is taken the provisions of the Worthless Check Act are not applicable. However, taking the position of the defendant at its best Mr. Chieffo never knew if he was being given a post-dated check that it was such a check. He insisted on receiving a check at that time fully intending to receive present consideration for delivering up a $5,000 note of the corporation. Wherefore, we believe both factually and legally that defendant's position is incorrect and that the Commonwealth has established a prima facie case to the offense of issuing a worthless check.

Defendant is charged with failing to pay to the Holiday Inn of Sharon total bills for meals and services in the amount of $377.03, which were incurred between January 10, 1970, and December 3, 1970, by and on behalf of the corporation, Transcontinental.[3] In order to win a conviction pursuant to this statute it must be shown that defendant with intent to cheat or defraud obtained food, lodging, credit or other accommodations. John Edward Wingert, the assistant innkeeper of Holiday Inn, testified on cross-examination that there were many other bills which were incurred by Transcontinental Leasing which were in

[3] This is pursuant to the Act of June 24, 1939, P. L. 872, sec. 871, 18 PS §4871.

fact paid, that Transcontinental had monthly billing, some of which were paid and some were not paid. The mere fact that a person runs a bill with an innkeeper and subsequently does not pay in itself does not establish any intent to cheat or defraud. The evidence in this case would seem to indicate the contrary, that Transcontinental was attempting to pay its bills but that as time progressed it was unable to do so. There was insufficient evidence to establish criminal liability by Francis E. White upon this charge.

The final charge involves the violation of a Hickory Township ordinance which has already been ordered by this court to be returned to the district magistrate for hearing in that it is a summary offense and by statute this court does not hear summary offenses until the district magistrate has had an opportunity to dispose of the same, after which the defendant, if found guilty, has the right to appeal. Hence, this order.

## ORDER

And now, October 20, 1972, as to the charge at June term, 1972, no. 98, dealing with violations of the Pennsylvania Securities Act, this court does find that the Commonwealth has established a prima facie case and directs that the matter shall be submitted to the next available grand jury.

As to the offense at December term, 1972, no. 14, concerning the issuance of a worthless check to Anthony Chieffo, it is the finding of this court that there is sufficient evidence to establish a prima facie case and that the matter shall be submitted to the next available grand jury of this county.

As to the offense at December term, 1972, no. 18, concerning the securing of $30,000 from William Tanko, it is the finding of this court that there is sufficient evidence for the establishment of a prima facie

case of securing moneys by false pretenses and for the offense of conspiracy and that there is insufficient evidence to establish the offense as charged of fraudulent conversion. The Commonwealth of Pennsylvania is permitted hereby to amend its criminal complaint to include the offense of receiving moneys or other valuable considerations through the offense of false pretenses.

As to the securing of $2,000 from Elsie Jean Fobes, it is the finding of this court that there is insufficient evidence to establish a prima facie case as to this offense.

As to the offense at December term, 1972, no. 13, concerning fraud upon an innkeeper, it is the finding of this court that there is insufficient evidence to establish a prima facie case against Francis E. White and the charges are dismissed and defendant discharged.